I think maybe my day sheet has the wrong counsel for the wrong... Mr. Meyer, are you representing Cottonwood Environmental Law Center, I assume? Yes, Your Honor. All right, I think my day sheet says that you're representing CH SP Acquisition, but unless you change sides... I do not. Okay, so you'll be going first, and then Mr. Goltz, is that right? You'll be responding. Okay, go ahead and start when you're ready, Mr. Meyer, and let us know how much time you hope to reserve. Good morning, Your Honors. May it please the Court, my name is John Meyer. I'm here on behalf of Appellant Cottonwood Environmental Law Center. I'd like to reserve two minutes for rebuttal, please. Cottonwood settled a Clean Water Act lawsuit against Spanish Peaks in 2022, and that settlement required Spanish Peaks to replace the holding pond liner that was leaking sewage into the Gallup River, and it also required Spanish Peaks to limit the volume of irrigation that was applied onto its golf course at 33.6 million gallons per year. Cottonwood then filed a second Clean Water Act case against Spanish Peaks, alleging that its spring treated sewage out of its snow guns onto ski slopes during summertime, and that so much sewage running down the ski slope that it's running down the road and getting into different tributaries of the Gallup River. Can I ask you a question? I think we're probably all very familiar with the facts of this. So why didn't you just seek to enforce the consent decree for the second volume? Obviously, the issue is whether or not it's encompassed within the consent decree. Judge Morris thought it was. Why didn't you seek to enforce the consent decree? In theory, that's better because you could get a contempt order or something from that. The consent decree required the defendants to provide Cottonwood with a copy of the nutrient management plan that was in place for the alleged violations. And so in this case, Spanish Peaks provided us with a nutrient management plan from 2017 for the first golf course, and that was it. We didn't know there was a second golf course, and we didn't know there was a second nutrient management plan. So we've always been on the impression we can only enforce a consent decree regarding violations of the nutrient management plan for the golf course. But there's a whole separate golf course and a whole separate nutrient management plan in here, and that's why we couldn't enforce the long answer that we couldn't possibly enforce the consent decree because it didn't cover these issues because it was covered under a totally different nutrient management plan. If this panel was to agree with Judge Morris and say, no, this is within the consent decree, in theory, if you thought they were doing something like this and it violated, could you now go and say this is a violation of the consent decree and attempt to seek relief that way? Your Honor, the consent decree requires Cottonwood to notify the DEQ of any violation that they think of the consent decree. And we have done that. We filed the complaint with the DEQ. They haven't done anything for a year. And so the consent decree says you can then file a case. And so we have filed a case. We are here right now. Again, the action in this case is totally different than the action in Cottonwood 1. No, I understand. I think we all understand your argument that this is different. But I'm saying if it's not, it doesn't – I'm trying to figure out if Judge Morris is right, do you still have some remedy? And that's the question, the specific question is, would you be able to do something under the consent decree or the consent order for the prior lawsuit? The consent order says this is your – you need to enforce it. And, again, there's not much to enforce, Your Honor. I mean, the consent decree is totally silent on spraying treated effluent out of a snow gun. Well, assume for a second that they just started spraying double the amount that the consent order says onto the golf course, to the sprinklers on the golf course. Yes. You would be able to do what? You would come and you would ask – We would notify the DEQ and then wait six months and file a complaint in federal court alleging a clean water violation. And hope – and you might not have to wait six months because hopefully the DEQ would go up there and do something about that.  And what do we take from the fact that the DEQ – I mean, in that instance, I'm talking about if the DEQ didn't do something, I suppose you might – it might appear to be some indication that the DEQ doesn't actually think that they're spraying double the amount of water. In which case, we would file a complaint. And here, do we take anything from the fact that the DEQ didn't respond, that they don't – that they disagree? I mean, part of their argument here – their secondary argument is that we can rule for them because there isn't actually any violation going on here and that evidence is unrebutted. So that goes to the actual merits, the summary judgment, and that's a question of fact. Whether they are actually discharging the sewage into the river, that's a question of fact reserved for the jury. Right, right. And I think we understand your arguments on that. And their arguments are that there's not actually a material – a disputed material fact because of the fact that they're saying there is no evidence on the summary judgment that you come – but I understand that. But I'm asking just a question about that, which is should we draw any sort of – that it doesn't actually – that it sort of takes their side of that characterization or why should we not? Your Honor, we filed a complaint with the DEQ regarding leakage from the Big Sky Water and Sewer District cooling ponds. We waited over a year and they did not do anything at all. They didn't respond. Like, total radio silence. So we filed lawsuits. You're talking about the big ponds that are at the bottom down there. Yeah, exactly. Yeah, you're a bobcat, so you know this stuff. I actually worked on those ponds. Oh, you did? Yeah, my dad's construction company. Like, that might be my liner that's leaking. So, okay. So I totally know what you're talking about. And you're saying – basically, I think you're saying the DEQ just isn't doing its job. Is that your position? And so we filed a complaint with the DEQ saying they're not doing their job. And the court ordered us to draft an opinion that we wanted it to adopt. And it said to both sides, the DEQ and Cotwood. So the court is amenable to hearing this idea that the DEQ is not doing its job. But in terms of this case – Judge Morris, you're talking about? No, this is state court, Gallatin County District Court. Okay.  Judge Morris's order, summary judgment order, says, Quote, Cotwood remains free to allege clean water violations against Spanish Peaks, distinguishable from the facts alleging Cottonwood won, even if such allegations are related to the alleged pollution of the same West Fork of the Gallatin River and its associated tributaries. And that's on page ER14. And then he issued a second order saying, Cottonwood has failed to present evidence that the activities challenged in this action and those previously resolved in Cottonwood won prove to differ significantly. And so when you look at the DEQ's language for its nutrient management plan, the second nutrient management plan, it says each of the three areas are significantly different from one another in their composition and the types of irrigation that will occur. So, Mr. Meyer, the relevant documents in this case are frankly maddeningly vague and inconsistent and ambiguous that let both sides argue them with full vigor, basically. One of the interesting things about this case is that the usual approach to the Clean Water Act's notice requirement is flipped as between plaintiff and defendant, right? You're saying the notice requirements are very tight. The defense is saying, oh, this was broad enough to cover our second golf course and so on. A lot of this frankly feels like word games to me. I was not involved in the construction of the relevant facilities here in Montana. It would be helpful for me to know a little bit about the geography of the two different golf courses and what streams they drain into and even the difference between the west fork and the middle fork of the Gallatin River. Yes, Your Honor. So to give you a very brief summary of what's happening, down low is Big Sky Water and Sewer District. It's the holding ponds where they treat the effluent. They then send it uphill to Spanish Peaks to irrigate on their golf course. They have one full-size golf course and evidently a second small golf course. And above all of that is the ski runs. And so they are now irrigating the ski runs in such a way that it's going down the grass in the summer and running down the road into the river. And so that then drains into the middle fork of the west fork of the Gallatin River. Okay. But all of the activity you're talking about drains into that middle fork of the west fork of the Gallatin River. Yes, Your Honor. Different tributaries, Your Honor. Okay. I guess the question is how big a problem that is, and we'll have to wrestle with this. Could I just ask you very briefly, I want to understand the relevance of the notice requirement here. Suppose you were bringing a nuisance claim under state law without the notice provisions of the Clean Water Act. Would there really be any doubt that your first lawsuit against Spanish Peaks would have been broad enough for claim preclusion to apply to the second? Your Honor, the activities that are being challenged, the activities that are causing a nuisance or a Clean Water Act violation are totally separate. I don't know what that means. You've got the same party, same general tract of land, same river that's being polluted, according to you, and the new activity that you're alleging was occurring before the entry of the consent judgment, correct? Before entry, after the parties entered it. Right. Well, let's be careful. Yeah. Exactly. After you filed to propose it. Correct. But before the judge approved and entered it. So the activities were going on before judgment. We had no idea that that was happening, Your Honor. Well, you did because you sent the notice, the second Clean Water Act notice, before the entry by the judge of that first consent order, correct? Yes. Okay. So you did know about it before judgment. The consent decree limits claims that were known and unknown, and we could have not possibly known they were spraying treated effluent out of the snow glen because they weren't doing it. I'm sorry. I thought you told me and you told the defendants in your second Clean Water Act notice before entry of judgment that they were doing these violations, right? We told the defendants after we filed our first 60-day notice and after we filed our first amendment complaint, we said, Right. Using a different mechanism to irrigate, to spray your sewage, and that's a separate violation of the Clean Water Act. So can I ask you? I've taken you way over time. I've taken you way over, but thankfully I get to control that. So we didn't have a lot of time for this argument. Sometimes that happens in this important case. I think my colleague Judge Hamilton sort of referred to this a little bit. There is a little bit of an oddity in this case in that as I read your arguments that are directed towards how we should interpret the 2021 notice, you're sort of strangely, at least in my view, asking us to read that very narrowly. And there's two oddities about that. One is just the general oddity that normally somebody on your side of one of these environmental cases would want a notice letter to be read broadly because normally it would be the defendant saying, Hey, the notice doesn't cover this, so you didn't get to bring the lawsuit and get to try to throw it out. If we were to agree with your narrow characterization of the notice letter, I'm trying to figure out how that notice letter would have covered the original lawsuit that was settled with this consent order. Because you talk about, well, the notice letter didn't mention snow guns, it didn't mention irrigating that wasn't on the golf course, but the actual notice letter didn't mention irrigation at all. It didn't mention golf course irrigation. It's very broad. It talks about effluent holding ponds and associated infrastructure as, quote, contributing to the issue. Those things contribute both to what you settled in your consent order, but it also obviously contributes to your allegations that are at issue in this case. And so I'm trying to figure out how we could possibly read the 2021 notice letter the way you're asking the court to read it narrowly and still have it have been broad enough to cover the first lawsuit. Are you following what I'm asking? Yeah, I think so, Your Honor. So the Ninth Circuit in a recent case, Cottonwood v. Edwards, said, the Ninth Circuit has never abandoned the requirement there be a true notice that tells the target precisely what allegedly did wrong and when. So what you're saying, I think, is that we have precedent that says we don't read these notices in a crabbed, really tight fashion. But you need us to for you to prevail in this thought. Normally you would not, and so there's a sense in which your argument in this case, if we were to accept it and write an opinion on that, would hurt you, I think, in future cases. That's why this case was a little bit odd from our perspective. Do you understand? I understand that, Your Honor. It would be impossible for us to write a notice saying you guys are violating the Clean Water Act by spraying treated sewage out of a snowgun when they had never actually done that. We could not give them the dates of the violation of when they're spraying out of snowguns because they hadn't done that. I totally get that. But then, so the challenge is that when you settled the case, you wrote a very broad notice, and when you settled the case you said, we're settling for anything known and unknown that relates to those facts that were in our very broad notice. And so if there was a mistake made, I suppose, one might say that the mistake was you being willing to enter into such a broad release that was tied to your very broad notice document. I understand your question, and I guess my best answer is that the claim was not known or unknown. There was no claim. You're saying it's not based on the factual allegations of your original amended complaint, right? There was no known or unknown claim. There was no claim. You can't assert a claim when they're not doing something. The challenge for me is different. Maybe this goes to Judge Hamilton's question a moment ago, which is that I think the letter in this case was sent November 4th. The consent order is entered November 16th. So it seems like you did know about the snowguns and such before that consent order was entered, and I'm just wondering why that isn't, I don't know, relevant to our evaluation here. I mean, maybe you already gave the answer. Judge Morris said that if the activities were different, he would hear this second case. And we have provided evidence to the court from the Montana DEQ saying the activities are significantly different. We're challenging totally different activities. The activity that we're challenging in this case didn't begin until far long after we filed our 60-day notice in Cotwood 1. I'd like to reserve just a minute for a vote, if possible. Yeah, we'll make sure and put a minute. Thank you, Your Honor. Thank you, Counsel. Mr. Goltz. Thank you, Judge Van Dyke, and may it please the Court. So settlements are supposed to end litigation. A plaintiff is not supposed to sue, settle without conducting any discovery, and then try again when it later learns additional details about its claim. But that's exactly what happened in this case. So I'd like to jump right into a few of the questions you just discussed with Mr. Meyer, because I think they raise some really important points about this case. One is the remedy here for Cottonwood based on its, you know, supposed discovery of the snow guns, the snow gun sprinklers, after the parties had submitted the proposed consent order to the district court. And this actually, Judge Van Dyke, to your question about, like, well, what was the remedy? What was Cottonwood supposed to do? Well, it was supposed to go to DEQ and raise its complaint under the consent decree. It actually did that in this case. And this, you know, isn't a matter of the record based on the timing of how this case proceeded, but DEQ did investigate Spanish Peaks, and it did close that investigation, finding that Cottonwood's claims didn't have any merit. So the remedy here and the force of the consent decree actually was acted upon. As to the consent order itself. So let me just make sure I understand. Under your theory of the case, if tomorrow you just opened up a two-inch pipeline and was just shooting effluent straight into, you know, one of these tributaries, your view is that they could bring a, they could come to Judge Morris and say, listen, the consent decree's, well, first of all, they'd have to go to DEQ, and presumably DEQ would do something about this. But if DEQ did not do something, then they would go to Judge Morris and say, after waiting six months, and say they're violating the consent decree. And you would not be able to, under your view, would not be able to say, no, the consent decree was about sprinklers on a golf course, and we're shooting it out a two-inch pipe straight in now. Is that correct? So under your hypothetical where Spanish Peaks is, you know, pulling water out of the whole 10 pond and directly discharging it into the river intentionally, yes, I agree with that. I mean, I think the nucleus of fact here that the consent order is intended to encompass fundamentally is Spanish Peaks' irrigation of its property with reclaimed water. And if Cottonwood discovered a Clean Water Act violation of a fundamentally different nature, for example, you know, discharging treated effluent intentionally and purposely straight into the river, that's not an irrigation purpose at all. It wouldn't be our position that that is, you know, covered by the release. So you say that, but the 2021 notice doesn't use the word irrigation at all. It just talks about discharging pollutants to navigable waters without a DES permit in violation of the Clean Water Act. So why would that, why would even the two-inch pipe not be included within the language of that notice and therefore included within the language of the consent decree? Sure. Well, and so I do think this goes back to the district court's application of the modified claim preclusion test in this case. So it's difficult to draw, you know, a bright line distinction between the claims that are going to be encompassed and not. It's always going to be a very fact-intensive inquiry that requires the district court to look at the language of the settlement and compare it to the allegations that are being brought. In this case, that, you know, if allegations of a two-inch pipe that was, you know, sticking right into the river were to arise, yeah, I mean, the district court would have to look at that factual allegation and understand its relationship to the allegations in the 2021 notice letter. And I mean, you know, now that I think about that, I mean, if that pipe were part of the irrigation system, you know, this is part of the allegation in the 2022. I'm not using the word irrigation, but if that pipe were downstream of those ponds, of the, quote, effluent holding ponds and associated infrastructure, that would be the language of 2021. Sure. But. The reason I'm asking this question is basically they have to know whether they need to go and try to file a new lawsuit, comply with the 60-day notice and file a new lawsuit, or whether they need to try to comply with the consent order, right? You know, they should. And so it seems to me like given the broadness of the notice and therefore the broadness of the consent, scope of this consent order, they would know that they could go and do the things that they're supposed to do to enforce the consent order, contact the DQ, and then if that doesn't work. But you're making it sound like, well, you know, I don't know. We don't know. We have to ask the judge to decide some really esoteric factual things, and that means that they might do what happened here, which is they just pick wrong. And then they've got to start. And I guess one question is if they pick wrong, what is the consequence of that? So in this instance, if he picked wrong, but if next year, let's change the hypothetical a little bit, you just start spraying directly from one of your snow guns into the stream. I assume your argument is that he could try to go to DQ, say, hey, they're spraying right off the snow gun into the stream. That violates the consent order. Do something about this. If something doesn't happen in six months from DQ, then they could come and try to enforce this consent order. Is that clear? I mean, is that crystal clear?  Yeah. And I appreciate the facts you're proposing. But, you know, on the facts of our case, the concern about whether Cottonwood was going to be confused about its potential remedies, that's just not how the facts proceeded in this case. Well, they obviously were, right? I mean, unless you think Mr. Myers did this intentionally. But I think, you know, he thought he should bring a new lawsuit instead of just seeking to enforce it. Why did he do what he did instead of just trying to enforce the consent decree? Well, respectfully, Your Honor, I mean, I think Cottonwood is trying to have its cake and eat it, too, here. Somebody is. Okay. Yeah. Let me ask if I could, Mr. Goulds. Let me follow up on that. No, I'm trying to figure out incentives here. So why do you say, I don't want to impugn Cottonwood, but I'm trying to figure out why is Cottonwood incentivized to do what they did as opposed to enforce it? Because normally you think if you've got a consent decree, that's pretty powerful. You can actually get contempt, et cetera. So why wouldn't Cottonwood, is it the six-month waiting thing? Is that, and maybe I'll ask him on rebuttal, but, like, is it, why wouldn't he prefer to go the consent decree route and argue that the consent decree is really broad, the consent order is really broad, rather than go this route that he went? That's one thing I'm a little confused about here. Sure. Well, in this case, for example, Cottonwood had discovered the snow gun sprinklers in, you know, mid-September of 2022. So going to the court at this point about this issue had the potential, I think, to frustrate or potentially blow up the settlement. And I think Cottonwood made an intentional decision not to do that. You know, as was its right, it brought a broad case alleging allegations related to a large system, and it entered a broad release that reflected those allegations. And, you know, it wanted to settle and reap the benefits of a settlement, including attorney's fees, including civil penalties in the form of a supplemental environmental project, and then try again once it got more information. So your point, just to be clear, is that they maybe didn't bring this as a violation of the consent decree intentionally because of fear that it would actually blow up the consent order that was in front of Judge Morris at that time to be signed. And then is there – would they, in theory, get, I guess, additional – get a settlement in this case that's different and get additional damages, or is that – I think the goal would be to bring another lawsuit and say this is a totally separate thing, this is a totally separate Clean Water Act claim. We settled that. We got our fees. We got our penalty. We've got a whole new case now. We can take a whole new case to trial and get totally different penalties, another attorney's fee award for litigating what is fundamentally the same conduct related to the same irrigation system. I apologize. Go ahead. If I could follow up on some of this. I mean, this is a – I'm trying to get my head into the Clean Water Act here with the notice requirements because this is so different and the doctrines as applied to this settlement and consent order are so different from ordinary civil litigation. And so the release has this, you know, broad language, all other claims known and unknown that could be asserted based on the factual allegations made in the amended complaint and 60-day notice letter, right? So that narrows things down considerably. Yes, I understand this is a matter of fact. Please correct me if I'm wrong. The second lawsuit and notice are alleging conduct on different golf courses. Is that right? Actually, respectfully, Your Honor, I don't think that's quite right. The irrigation at issue in the second case is occurring on a forested area that's next to ski slopes that are right next to the – Yeah, okay. Go ahead. That are right next to the 18-hole golf course that was – that Cottonwood ultimately moved its focus into on the first case. Do they drain – do the ski slopes drain into the same smallest tributary as the – as was alleged in the first notice? I thought it was agreed that they went into separate streams. I'm not sure it's agreed as a matter of the record. It was. It's a bit – This is geography. I kept looking for maps in the record. Yeah. Well, for a little bit of context, in the 2021 notice letter, Cottonwood alleged this violation related to our irrigation system, and it provided sampling data in the Middle Fork Gallatin River above and below a tributary that entered the river. So a single tributary that enters the river was the basis for its claims in that first case. And that tributary, once it moves away from the river, as most tributaries do, it has lots of little branches and things that run at certain times of year or don't and different things like that, but it's all fundamentally the same tributary that's entering the Middle Fork from Spanish Peaks property, and that was – that was the – So all Spanish Peaks property feeds into the same unnamed tributary? All of the – I don't even – I couldn't even put a number on it. You know, dozens or branches of this unnamed tributary system that cross the property ultimately converge into a single channel that enters the Middle Fork. Okay. Mr. Meyer, I'll be interested in your perspective on that in rebuttal. Let's see. I guess if I could ask you to hypothesize a little bit more, Mr. Colts. Suppose there had been no settlement in Cottonwood 1 here, and you were litigating ahead. In September of 2022, plaintiffs hear about these snow guns. They seek to amend their complaint. Can they do that?  And I guarantee you had this case proceeded in that manner, that's exactly what would have happened. You know, what – You wouldn't have tried – you wouldn't have had a valid objection based on the scope of the first 60-day notice? The original 2021 notice letter on its face absolutely included the snow gun sprinklers. What language do you rely on in that? Sure. So that's in the record at – I believe it's SER 142. And that is Cottonwood's 2021 notice letter referring to Spanish Peaks effluent holding ponds and associated infrastructure as contributing to the nitrogen discharges to the Middle Fork that Cottonwood alleged in that case. And that language, associated infrastructure, is absolutely key here. Because what Cottonwood was targeting, and what the district court identified as the core nucleus of fact here, was nitrogen discharges from Spanish Peaks reclaimed water irrigation system. And just like the sprinklers that are located on the golf course or on the other areas next to the golf course, the snow gun sprinklers – which, by the way, Cottonwood actually refers to as sprinklers in its amended complaint in this case – draw the same reclaimed water from the same pond and use it to irrigate property that's right next to the golf course. And so, you know, and to your question earlier about the geography here, I would just direct the court's attention to two maps that are in the record. One is at SER 163, and the other is at SER 250. And that shows the scope of the irrigated footprint of Spanish Peaks property. And all of those parcels – I mean, they interlock like puzzle pieces. They're right next to each other, and they're all operated in conjunction. So we're not – you know, we're not talking about associated infrastructure of some totally different type of geography. It's all the same stuff. Okay. I see I'm over time here, Your Honors. In closing, you know, the district court carefully looked at these facts and determined that Cottonwood's lawsuit concerns irrigation of the same property with the same reclaimed water stored in the same pond at issue in the consent order that the court signed in the last lawsuit. Cottonwood had its day in court, and it had time, and it had information to pursue its claim. So it doesn't get to pursue that claim again. The court should affirm. Before you sit down, let me make sure my colleagues don't have any further questions. Okay. We'll hear again from Mr. Meyer, please. Thank you. Your Honor, you asked about the different streams. If they both discharge into the smallest stream and they do not, they discharge into totally different streams. So in Cottonwood 1, we said there's a tributary that seems to originate on the golf course. We believe you're polluting that. In this case, we said you're irrigating a stream that's totally different from the one starting on the golf course. We gave the GPS locations. We provided a declaration. I was looking at the complaint, even. You know, it seems like the notices – would you agree that the notices has really broad language, doesn't even talk about irrigation, and the complaint seems to kind of narrow down a little bit, the amended complaint. I'm talking about the first amendment, not the one for this case, but the one involved. But even that amended complaint talks about the treated sewage pond and associated equipment as point sources. It talks about the golf course and related equipment, including but not limited to sprinklers and drains. And then it talks about a stream that travels through the Spanish Peaks golf course. And so it seems like these are very broad. I mean, I don't know that I see the word tributary in here at all. And so it seems like they're very broad allegations, even in the complaint. And so, once again, it feels like you're sort of discussing those like everybody should have known that those would be narrowly mean just as one single tributary, which we're both very familiar with what it's like up at Big Sky. I mean, literally, it's stuff right. So, of course, any one acre of land is going to have multiple tributaries on it if you count it as divots in the ground where water could run down and then meet up and eventually flow into some fork of the Gallatin. So I'm trying to see how you would know that from this complaint, that you were narrowly focused on just one tributary. Your Honor, again, the notice says or the complaint talks about a tributary that appears to originate on the golf course. And then we entered a declaration from a Cottonwood member or employee saying, I accompany a Spanish Peaks member to the site of the spring that was described in order to determine if the alleged spring was occurring on the golf course and or polluting the same unknown tributary of the Gallatin River that was described in Cottonwood 1. The site I visited in the GPS coordinates was not located on the golf course. And so a fundamental tenant of the Clean Water Act 60-day notice requirement is to give the exact location of where this pollution is occurring. And we did not ever say that you're polluting this area. We never said you're polluting the stream because they were not at the time. Your Honor, I heard the words cake and eat it too. And it raised my hackles. It really raised my hackles because we're a community-based organization. We want clean water. We have members who fish the Gallatin River. We all want clean water. And Spanish Peaks says, well, we got busted polluting because of the leaking holding ponds, so we settled that. But now we can keep spring-treated sewage out of snow guns away from that area as much as we want and keep polluting the river. Ask the questions I was asking because that would be a problem, right, if basically there was some interpretation that would allow them to just violate the Clean Water Act and not have some remedy. But it seems like that either you can bring this lawsuit, which Judge Moore said you can't because it's encompassed, or you could bring something under the original lawsuit. And so you're not without a remedy under Judge Moore's interpretation, I don't think. But tell me if I'm wrong about that. You asked the defendants if we would be able to bring this, if we would be able to amend the complaint and bring this in the first case. No, you can't do that now. What I'm saying is I think that was a question about if before the consent decree was entered, as I understand it. What I'm saying is you have a consent order, and so if this is included within the scope of that consent order, as Judge Moore has concluded it was, then you're not without a remedy, right? You can just come in and ask for DEQ to enforce, and if it won't do it, then you can go before Judge Moore and say they're violating the consent order, right? You're not without a remedy. I just want to make sure that I'm right in thinking that. If I'm not, then I think you have a really strong argument. I don't read the notice letter or the amended complaint to talk about spraying sewage out of a snow gun at all, and so the consent decree doesn't talk about spraying. This is important. I think very carefully before you answer my question because this will be used against you in future litigation. If Judge Moore's decision is upheld, and tomorrow or right after it's upheld, they start spraying water right out of a snow gun directly into some stream, right, then do you think you will be able to go and try to get that stopped by seeking to enforce the original consent order? It depends on where they're spraying, what the activity is. If it's a significantly different activity, we can file a new case. As Judge Moore said, you can bring a second case. If the activities are significantly different, but I've decided they're not significantly different, and that's why I'm here before you today saying, hey, the Montana DQ has said these activities are significantly different. I mean, it says right there, the DQ said in print, these activities are significantly different. So we can bring a second case. All right. Well, let me make sure. Is that in print in the NMPs? It says that in ER 156. Thank you. Are there any other questions for my colleagues? All right. Well, thank you, counsel. Thank you to both sides for your argument in this important case. And this case will be submitted as of today.
judges: Hamilton, VANDYKE, THOMAS